Good morning everyone. The first case this morning is No. 04-1562, Astra Aktiebolag v. Andrx Pharmaceuticals. Ms. Dale. Thank you. May it please the Court, Margaret Dale and Pascal Rose for the appellant, cross-appellee, Andrx Pharmaceuticals. Your Honors, this morning I'd like to address two issues. First, the District Court committed legal error in failing to decide Andrx's counterclaim of inequitable conduct. Inequitable conduct and fraud is a basic building block, together with unclean hands, of Andrx's infectious unenforceability counterclaim. If the keystone driller doctrine of infectious unenforceability doesn't apply to this case, which is beyond exceptional, then the doctrine is dead. We've proven that Astra used its omeprazole patents in Korea to open the files of its competitor. Now the merits are not before us, so you really need to concentrate on why the judge somehow abused the discretionary decision not to reach this issue. Because she should have reached this decision, because under thin control and Bildex, Andrx is entitled to a determination on its counterclaim. The Court has said repeatedly that inequitable conduct is one form of unclean hands. She didn't reach that, yet she determined that Andrx's unclean hands counterclaim, she was not determining the component of the inequitable conduct, which is a basic building block. We've proven that Astra misrepresented the origin of the process claimed by the 281 patent. Now you're talking about the merits. We still need to know why this issue needed to be decided after a judgment in your favor. Because the wrongdoing, the inequitable conduct was intertwined with the unclean hands before the district court, which would then render, which would lead to infectious unenforceability of the patents in suit, the 505 and the 230. Is that the point, that the other patents would be affected? Yes ma'am, because of the relatedness component. Keystone Drillers and Consolidated Aluminum Corp both require that there be a relatedness among the patents. We've proven that here. Well, that's really what I'm trying to understand. Your position is that unless relatedness is established, inequitable conduct does not need to be decided? I'm arguing that inequitable conduct needs to be decided as part of our infectious unenforceability claim, and that the infectious unenforceability... But the 281... ...works here because of the relatedness. But the 281 is in a different family than the 505 and the 230 and different priority applications. It was filed nine years later, for heaven's sakes. Consolidated Aluminum doesn't require a familial relationship. They have to have an immediate and necessary... No, but there's got to be, in fact, it's got to be close enough to infect. This is kind of a distant cousin. Your Honor, the judges district court... Distant cousins, huh? Your Honor, the judge's opinion at Appendix A6, she... I'll quote. It says, thus, the result of the 281 process is to manufacture a formulation for a proton pump inhibitor like that claimed in the 505 and 230 patents, which has three distinct layers. The relation is right there. It's the same subject matter. The specification of the 281 patent refers to the 505 patent expressly. This is at Appendix A48, and it says, there is a demand for a new process that is not as complicated as the three-step approach in the 505 and 230. This is an improvement, which is... I'm sorry, go ahead. Really, to pursue the same... Your position, then, is that if the patentee is shown to be, let's say, a bad actor in one case, that every other patent related to that subject matter is then invalidated? I'm not saying that, Your Honor. I'm saying that in this case, ASTRA brought the 281 against Andrax, specifically, and with the 505 and the 230, in the same proceeding, the district court spent resources, devoted time, the trial was delayed. There is relatedness because of the same subject matter. It's in the specification. That's what I asked. You're saying... But they won on the others. They won that Andrax had infringed the 505 and the 230. Correct. So those were well justified, so justified that they prevailed. I'm trying to figure out why they have somehow tainted their case by having another patent that the court eventually found invalid. They brought the 505 and the 230 against Andrax and then asserted the 281 in addition to that. The assertion of the 281 and the entire reason why they went and procured the 281 was because they saw that there was a chink in the wall, the patent wall. The 505 and the 230 didn't cover a process of a spontaneous subcourt foreman. They found that because they learned about it from CKD in proceedings in Korea. So then they go and apply for the 281 and then bring it against Andrax in the district court in the Southern District of New York. Now you're discussing merits that were not decided by the district court. So let's really stick with the question of infection or whatever it is that is fundamental to why this needs to be decided. Could I ask just a procedural question here? Certainly. This is the phase two appeal which was dedicated, as I understand it, to 281. Phase two and phase four, correct. Right. But the other patents were not really at issue in this phase as to which this appeal is coming up. Aren't you really trying to, in effect, go back and deal with issues that have already been addressed in connection with the other patents? I don't agree. We raised unenforceability, inequitable conduct with respect to the 281 in our phase four proof. Right. That was how the judge determined it. With respect to the 281, that's right. What we're now arguing is that the reason that that issue ought to be decided is because if you should prevail on that, that would give you a leg up for prevailing on the infectious with respect to patents that are not at issue here. Why isn't that an issue that should be addressed or should have been addressed or could? Rule 60 or whatever around could be addressed in connection with another phase, not the 281 phase. Your Honor, that was the way that the court procedurally phased the proceeding. Phase two was purely a determination of invalidity and infringement of the 281. Phase four was our equitable defenses that related to the 281, which included infectious unenforceability. What's the current state of the 505 and the 230 litigation? It's been completed. There was a decision of this court in December of 2003, affirming the district court's determinations with respect to that. There's nothing else pending with respect to those patents, correct? Right, except for this. Well, except that that's the question, isn't it? I mean, have you, in effect, lost your opportunity or had your opportunity to challenge inequitable conduct, whether infectious or otherwise, with respect to those patents by virtue of the judgment that's been entered with respect to those patents in the earlier phases of the case? That's really my question. Well, our argument is no, we didn't lose that because we raised— Why not? I mean, did the judge say, well, wait on any question of inequitable conduct until— As a matter of fact, the judge said she would wait on a determination of attorney's fees as to whether this was an exceptional case. Let's just look at the question of inequitable conduct, unenforceability of the other patents. Did she prohibit you from litigating that question in the earlier proceedings? We would argue that she did. By virtue of failing to address the inequitable conduct component of our counterclaim in Phase 4, she foreclosed us from raising this issue to this Court at an earlier time. We had to wait until she made the determination on Phases 2 and 4, which followed her determination on Phases 1 and 3. It was the procedural outcome of the way the case was phased. And by failing to address the inequitable conduct at all and dealing with it and choosing to determine that unclean hands— She rejected our unclean hands argument without even addressing one large component of that. That is legal error, and a minimum that has to be remanded to her for factual findings. The other issue that I would like to raise with the Court is the legal error that was committed by the District Court in finding that Andrix's product infringes the 281 patent. The District Court never determined that the water solubility limitation of Claim 1 of the 281 patent was met. The patent is at A53 of the appendix. Instead, the District Court relied on a prior ruling concerning the 505 and the 230 patents that determined only that the product met the claim limitation, that the subcoat layer be either, quote, soluble or rapidly disintegrating in water. Now, you're in your rebuttal time. You may use it, of course, for this argument or say that it's up to you. The only point, Your Honors—I'm going to use it at this time— is that this Court, in the prior ruling, affirmed the District Court on a finding of rapid disintegration, which was one part of the 505-230 claim limitation. It could be either water-soluble or rapidly disintegrating. I'm reading from the Court's decision of 12-1103. Quote, the claims require only that the subcoating rapidly disintegrates in water. The District Court credited evidence that insoluble particles with an otherwise soluble film material do not necessarily prevent the overall film from disintegrating in water. So you're saying that's not the law of this case? Correct. The claim limitation here is water solubility. It hasn't been met. Thank you. Thank you, Ms. Dale. Mr. Taylor? May it please the Court, Your Honors. Errol Taylor from Milbank for AstraZeneca. With me at council table is Jay Alexander, also from Milbank. To address first the issue of whether the Court's decision not to make detailed findings with regard to inequitable conduct was proper, I say it was absolutely proper because this Court ruling on inequitable conduct could not affect any legal right of the parties. And here's why. Andrix has no current ability to prevail on a claim for attorneys fees. It has no viable antitrust counterclaims that these inequitable conduct claims could affect. And its arguments with regard to unenforceability, with regard to infectious unenforceability were not properly brought before the District Court. And if they were before the Court, they would not and could not lead to invalidity of the 505 and 230 patents. When you say that there's no viable antitrust counterclaims, did the trial court dispose of the antitrust counterclaims in your view? I read the judgment, and the judgment seems to address affirmative defenses but not the affirmative counterclaims. Do you understand? With specific reference to counterclaims of 18 and 19, did the court dispose of those counterclaims in its judgment? It did not, Your Honor. Where are they then? They were severed and stayed. Severed and stayed. Now, to the antitrust did not plead antitrust counterclaims related to this 281 patent infectious unenforceability. Let me back up and figure out exactly where we are on these. So counts 18, which is a 281 count, and 19, which is also a 281 count, and these are counterclaims, you say were stayed, and what's their status right now? They are stayed in front of Judge Jones in New York. So no discovery or other proceedings has occurred. And we have a final judgment here. Why, if we've got counts that are still pending from the original complaint and answer? Why is this a final judgment? Well, that's another issue in Andrick's notice and appeal. They didn't raise the antitrust counterclaims as a reason why this case should not be presented before this court. Is an antitrust counterclaim appropriate in a Hatch-Waxman proceeding? Your remedy, conceivably, is to go into the marketplace. How is there an antitrust counterclaim in a setting where you have an artificial infringement finding just to enable a court proceeding on validity? Andrick's antitrust counterclaims were primarily based on a concept of sham litigation. We know now, since AstraZeneca has prevailed in litigation, that those claims will likely be dismissed if we ever get back to them in the district court. So I would not disagree with you, Judge Rader, that in these kinds of cases, antitrust counterclaims are not a stretch. Perhaps sham litigation would be the one potential. But again, the sham litigation is a little hard because it starts by virtue of a process that allows them to more easily challenge you without having necessarily standing by infringing. I would agree with you again. Takes me back to the days of writing this thing, which I have since regretted. We'd be out of business. Yes. So back to the issue of the unclean hands part of Andrick's argument as to why the district court should have addressed the inequitable conduct arguments on the 281 patent. Andrick's counsel just mentioned that there was this claim of infectious enforceability that the 281 patent was in some way tied to and related to the 505 and 230 patents. Well, it's not. As you mentioned, Judge Rader, the patent was filed nine years after the filing of the 505 and 230 patents. Any allegations of inequitable conduct with regard to the 281 patent has absolutely nothing at all to do with the 505 and 230 patents. But that goes to the merits of the infectious unenforceability issue. I mean, you don't want us to address the merits, I take it. We do not think it would be appropriate for this court to address the merits. So the question then is, do you think that this is an issue that is simply not pertinent to the phase two and four phases of this case? We think the judge was absolutely correct not to decide the inequitable conduct issue because the decision on that issue could not have affected any right of the parties before the court. You mean with respect to the 281 patent being... I mean, it certainly could have affected the rights of the parties with respect to the other two patents if, for example, contrary to your submission, the judge had said yes, there is infectious unenforceability. Well, it's in our view clear that the judge would not have found infectious unenforceability. But again, that's on the merits. What I'm really trying to get at here is the question that I asked Ms. Dale, which is whether the status of the 505 and 230 patents, which is what the infectious unenforceability ultimately goes to, is not an issue that was before the court in this phase of the case. Now, she says, well, it was. Do you say that it wasn't? Setting aside the merits altogether. Andrix clearly argued in phase four of the litigation that certain conduct of AstraZeneca would result in unenforceability of the 505 and 230 patents. But that conduct that they alleged below was the conduct that the judge specifically addressed in the opinion that we are now discussing in the appeal. There were three areas where Andrix contended that litigation misconduct would render the 505 and 230 patents unenforceable, not conduct with regard to the prosecution of the 281 patent. The judge specifically addressed those arguments with regard to misconduct raised by Andrix below and found that she was, and I'm quoting now, utterly unpersuaded by Andrix's arguments regarding unclean hands. Now, on appeal, the inequitable conduct arguments which were not addressed by the court have now morphed into another unclean hands allegation that Andrix is making to this court that was not clearly raised in the district court. So that's another reason why this court should not remand this case for findings on inequitable conduct with regard to the 281 patent as it relates to the unclean hands argument because that argument was not properly raised before the district court. Judge Jones was very clear in her opinion that she addressed the three areas of unclean hands raised by Andrix below and was utterly unpersuaded that they met their burden. I'd like to talk just for a moment about two other things. One is Andrix's appeal of the non-infringement finding by court. Andrix is wrong when it says that the court did not find that its sub-coating was water soluble. The court found in the phase one and phase three decision that was affirmed by this court that the sub-coating is water soluble and is formed as a water soluble salt between the core materials and the interior coating. That decision was affirmed by this court, it's law of the case, and Andrix was precluded from challenging that finding now. Also, with regard to the 281 patent claims, the claims do not preclude the inclusion in the sub-coating of materials which are insoluble. Now, the claims talk about a coating which is formed as a water soluble salt. For example, if you see claim one, that's what it says. A claim is formed as a water, sub-coating is formed as a water soluble salt. Column five of the patent says that the layer, this sub-separating layer, comprises the salt. The examples in the patent disclose enteric coating polymers which include other materials in addition to those that form the salt, including materials which are water soluble. Judge Jones was correct when she decided that Andrix's sub-coating, which includes talc, small amounts of talc, which is an insoluble material, still met the limitation of the 281 patent claims that the salt that is formed is water soluble. I'm sorry, where was the reference to comprising again that you were just citing? It's in the 281 patent, column five, lines 42 and 43. Ah, but not in the claim. I mean, the claim refers to a process comprising, not the layer comprising. Exactly. So, but you're referencing five and, what is it, 40? 42, 43. I see that I am in my rebuttal time, but I did want to make just a statement or two about our cross-appeal on the validity issues. AstraZeneca believes that the court clearly erred when it found that the CKD patent application anticipated the claims of the 281 patent. When the CKD application, there is no evidence that it actually enabled the in-situ formation of a separator, which is the… Well, it didn't teach anybody how to do anything, but if all the ingredients were present, wasn't the reaction in the prior art, wasn't it in the public domain, and therefore doesn't it anticipate? Absolutely no. The anticipation holding was based on the theory of inherency. Yes. The CKD application did not include process details that would lead inherently to the formation of a subcode. Where Judge Jones erred was to rely on supposed admissions by AstraZeneca in the Korean proceedings. Are you suggesting there could never be inherent anticipation of a process? Because, again, by virtue of the nature of inherency, something is always missing and processes are amenable to such easy change. I'm absolutely not asserting that. In this situation where the evidence was that there were certain conditions which were necessary to form an in-situ subcode, and the only evidence of anyone repeating the CKD application was presented by AstraZeneca's employees, and they testified that at 70 degrees, the temperature disclosed in the CKD documents, subcoding is not formed, but at 42 degrees, the temperature range disclosed in the AstraZeneca patent… Of course, that process limit is not found in your claims. And it need not be in the claims. Enabling disclosure, of course, can be in the specification. And this is another area where Judge Jones erred. She looked and said, well, your claims disclose no more than the CKD application. Well, that's not an appropriate question. The question is, does the CKD application enable the production of an in-situ subcoding? And does every possible of the parameters under which someone could repeat the CKD application, would that invariably lead to the production of an in-situ subcoding? But she also relied on the testimony of Vanna Kerr, is that the right name? Particularly with respect to Lovgren, he's testified, as I read his testimony, that with regard to examples, I think one at least and two perhaps, which did not have process, they were purely contents, that a person of ordinary skill in the art would know how to do that process that would lead to the results of the invention. That seems to me a pretty good description of enablement. That testimony was taken out of context, and that testimony is also in the context of the patent, the 281 patent, which includes all that other disclosure about process information. It's quite another thing to say that that testimony about his patent then enables the processes disclosed by prior art reference, especially a reference that discloses on its face that a separating layer is not formed. But they did discover that the separating layer was formed. Doesn't your argument have to be that their discovery that under the specific conditions that were actually used in Korea, the separating layer was formed, nonetheless, did not explain that at higher temperatures, it was not formed, for instance, and the other points that you've made. This is really a very difficult question, and I think we might enlarge the time for both sides to explore it. Because there was no charge, as I understand it, of derivation. We've been told that that was a strategic decision in order to obtain this infectious relationship. So without a charge of derivation, it's entirely a question, is it not, of whether your argument that to be inherent, it must always necessarily be formed, Well, I'll question the premise that under the specific conditions, the layer was formed. Again, the CKD application does not disclose specific conditions which lead to, invariably, to the formation of an NC2 subcode. But they learned the conditions through discovery, I gather. Well, again, they did learn that through discovery in this Korean proceeding, they did get a batch record from CKD, which is different than the CKD application. The judge, Jones, relied on the CKD, and again, this CKD batch record is not prior art. It's not what the court relied on for a decision, and the tie between the CKD batch record and the application is tenuous at best. What Astrid argued in the Korean proceeding, and which Andrix convinced the judge to rely on, is that the product that Astrid saw in Korea has a subcode. CKD says that this product is made by a certain general process that has no process conditions attached to it. A process that they disclosed as method A. And therefore, some conditions that are within that method A lead to the formation of a separate layer. Isn't that enough for inherency? Absolutely not. For inherency, for AstraZeneca to have admitted inherency of the CKD application, it would have had to have said first that every condition that anyone could use within that general disclosure of the CKD application invariably leads to the formation of a separate layer. AstraZeneca absolutely did not say that, and in fact, they said the opposite. When they tested the CKD batch record at 70 degrees, the ordinary temperature for enterocoding, the separating layer was not made, but at 42 degrees, the conditions that Astra's scientists devised, the separating layer was formed. But in this case, this is a tried case, so with respect to the anticipation issue, I guess it's a question of fact, and the question is whether Judge Jones committed clear error in her findings. And she found, as I read her opinion, that crediting and interpreting the testimony of Banneker and Lovgren, that a person of ordinary skill would know how to do this process and would achieve the result that was achieved in the Korean patent application. Your argument has to be, I guess, with respect to at least those elements of her analysis, that she clearly erred in her interpretation, or that she simply could not properly have accepted the representations made by those two experts. Those two representations, even if true, doesn't convert a reference that does not disclose a separating layer into a document that, based on inherency, anticipates these claims that require the formation of an in-situ separating layer. That's where the court erred. To show inherency, you must have clear and convincing evidence that each and every time, under all the various reasonable conditions that one could undertake to repeat that reference, you would invariably come to an in-situ separating layer. And remember, this is a reference which was based on a finding that you could produce this product without a separating layer. Okay, let's hear from the other side, and we'll save you rebuttal time. Okay, Mr. Neal, would you enlarge Ms. Dale's time by the amount we've run over? Okay, you can use the time as you wish. Thank you. I would like to just, before we go back to the issue that we were just discussing, in the 37th affirmative defense, which is in the record at A675, Andrix asserted that Asch was equitably stopped from enforcing all of the other patents asserted against Andrix in this action and in related litigations, as they may relate to Omeprazole, to the fullest extent permitted by the applicable law of Keystone and its progeny. And we tried that issue in Phase 4, pursuant to the structure that the district court set forth as to how to proceed. Inequitable conduct is a subset of unclean hands. The court can't jump, the district court can't have jumped to a determination that we did not prove unclean hands without considering inequitable conduct. That is our basic argument as to why error was committed by the district court in determining that inequitable conduct was moot. What is the status of your counterclaims? The counsel says that they're pending. We assume that, depending on what happens in this court, we may have to go back and address those counterclaims. Why do we have a final judgment then? Was there a 54B certification with respect to this part of the case? No, there was not. Isn't that a problem? Your Honor, she severed the antitrust counterclaims the district court did. But with respect to this aspect of the case, in Phase 4, she found a final judgment, but without determining one aspect of the counterclaim for unenforceability. I'm not making myself clear. The judge determined that we had not, she rejected our unclean hands argument. But our unclean hands argument is dependent upon one aspect of, it's dependent upon inequitable conduct which was never reached. I don't see how, I think that is the error that we are asserting here, the legal error. So you're saying that the case is over unless you reopen it? Correct. This court needs to, there was error in determining that a final judgment had been reached on unclean hands without determining one aspect of it, which is inequitable conduct. The worst conduct that was committed by AstraZeneca was related to its misappropriation of the 281 process. I don't understand. How could you bring an appeal if there are outstanding claims? And if there are not outstanding claims, you tell us there are. There is an outstanding claim to the extent that the district court failed to rule on one aspect of our counterclaim. Did you request a ruling? We certainly did. We requested that she determine inequitable conduct. She determined it to be moot. We're talking about the antitrust counterclaim. Those have been severed and those You say that's alive? I think those are alive. Only if we send this back. Send this back. I think If this is affirmed, the case is over. Correct. Thank you. To address the anticipation argument, the ruling of the district court To have inherent anticipation, you must necessarily always have present the claimed invention. How does the Korean application disclose temperature, for instance? How does it necessarily require the presence of the proper temperature so we know that the process is actually going to be working? The application discloses the ingredients and the process without giving specific parameters. But that's not important. According to if I were following that application, I may not perform the process. I may not create an in situ layer at all. No, that's not true. Separating layer. The testimony that was credited by the district court was that a separating layer will form each and every time if you follow the CKD application. All of the evidence in the record was that it forms every time. There was evidence of Dr. Rhodes. You're skipping a step, it seems to me. I have the same question as Judge Rader. If you follow the CKD application, what you have is a pile of materials in front of you on your lab table. You don't have a process. It's conspicuously absent, at least except for a very brief reference as far as I can tell, is process. It has components. The question is how do we jump over that? Now, as I understand what the district court said, the district court said any person of skill in the art, as testified to by Lovgren and Banneker, would know inherently that this is what you do with these products in this setting. Now, is that enough? The question is, is that enough to establish inherency? It is. I'm sorry. Go ahead. It sounds more like enablement. Is it good enough for inherency? If so, what's your best authority for that proposition? It is good enough for inherency. The process conditions are simply ones that any skilled formulator would understand what to do. Even the Koreans in Astor didn't seem to know what was going on when they went into this. I mean, you say it was necessarily known by one of skill in the art. They didn't seem to know what was going on when they started this litigation. They were suing them under a three-step process, and the record seems to suggest both parties were shocked to find out they had a two-step. Well, all the CKD application said was you don't apply an extra step to form the subcode. I'm just trying to see how, in that setting, you're saying everybody knew to perform it at the right temperature so you'd get the right process, yet everybody didn't seem to know. Well, all of the evidence in the record shows that it forms. Every time it was tested by Astor, by the special master in the Korean proceeding, the 70 degree temperature is litigation testimony. There is no evidence in the record to support that. But neither side showed, I think everyone agreed that at the 42 degrees it formed, but nobody showed that it formed at the 70 degrees. Generally, it seems as if the experts didn't disagree on this, that the temperature was important. There is no magic to the 43 degrees. That is a complete litigation-related post-fact. Well, all of this is litigation-related, but you're telling us that we need to assume, despite all of the evidence, statements, opinions of the experts, that at 70 degrees something quite different happens. The process parameters are ones that any skilled formulator could understand. There was lots of testimony about that which was credited. Your side had the burden of proof on the adherency. And we proved by Banneker's testimony that it would form every time and by the other record evidence that we put into the record. Yes, at what temperature? It formed at different temperatures. What evidence is in the record at what temperatures? We have the CKD application, which is in the record at A808. And what temperatures are shown in that application? I don't believe they show a temperature. That's our point, that there wasn't an actual temperature shown in either of the examples of this application. I'm trying to put a little bit of substance on your generalization that the layer forms at all temperatures. And I've asked, where is the evidence? If you could give me a minute, I will try to find it. It's not in your briefs, right? Other than their evidence at 42 degrees? Well, there is evidence that it forms at different temperatures. I just don't have at hand the actual examples. All right, we'll find it in the record. I think we need to move on. Could I ask just a purely procedural question again? Sure. Very quickly. By my count, and I may have undercounted, but there's at least three translations of the Korean application in the appendix. You've cited the one. And this would be trivial concern, except that they are quite different, frankly. Did the trial judge pick one of them as the most authoritative? I'm thinking of 13957, 8084, and 9618. And the reason I ask is because one of them has language that seems to me to be sort of pertinent to one of the central questions here. I think the 8084 refers to an enteric coding without applying an endothelial layer, which suggests that maybe the endothelial layer exists, there's no dispute about its existence, but it wasn't separately applied, in other words, rather than without there being an endothelial layer, which is the suggestion in the other translations. So did the trial judge pick one of the translations and settle on one? Yes, the trial judge picked the translation and... Because I'm not going back to the original Korean. ...the original Korean was the one the trial judge laid it to. All right, that's fine. That's what we'll... Okay. Thank you, Ms. Dale. Thank you. Mr. Layer, you have a... Mr. Taylor, you have a few minutes. Just for the... Just on the cross appeal. Just a couple of minutes on the cross appeal. On this issue of the process conditions and the actual testimony with regard to that, Dr. Banneker, Andrex's expert, testified at trial that for him to determine, to know whether an in-situ separating layer formed, he needed to know both the ingredients and the process. And that's at appendix 6905. Ashford's scientist, Dr. Lundberg, who was one of the inventors of the two-way form patent processes, testified that when he tried to repeat the CKD batch record, he did not obtain an in-situ subcode using ordinary process conditions. And I'm quoting from A7383 in the appendix. He said, quote, I had no success getting that. And that was referring to using the higher temperatures. And he goes on to say, I finally ended up with a lower air inlet temperature of 42 degrees. And also later on in that same line of testimony at A7385, he testified again that he couldn't use the 70 degree temperature. The only evidence in the record is that temperature matters. The CKD disclosure doesn't have temperatures. It cannot inherently anticipate the claims in the two-way form patent. You cited 6905. What was the particular testimony at 6905 that you were referencing there? Because I'm looking at 6904. He says that a person of ordinary skill in the art and formulation sciences would know how to do this formulation. That's correct. We don't have a generally enteric code. That is no question. Well, the context of that question is not generally. It's with respect to the process that results in the formation of the enteric code in the CKD application, as I understand that context. What was it that you say where he backs away from that on 6905? On the next page, 6905. Specifically where on 6905? Page 5351 in the transcript. All right. Do you have a line? Yep, line 11. I'm quoting. I believe I was asking these questions. All right. Quote, so is it your testimony to figure out for you to know what the product structure is of a product? All you need to know is the ingredients. Answer. I need to know the ingredients and the process. Question. And the process? Answer. Yes. But where does he refer? You said something about 70 degrees? That's not on that page. This is Dr. Bannekart. Oh, okay. Dr. Lundberg, the astro-scientist, specifically referred to the 70 degree issues because he repeated the CKD batch record, which also didn't have detailed process information. And that testimony is on record pages A7383 and A7385. Okay. Thank you, Mr. Taylor. Thank you, Ms. Dale. The case is taken under submission.